# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MILO BAKER, a minor,
by MICHELLE BAKER, his mother and
natural guardian
          Plaintiff,

    v.                                      Case No. 05C0652

JO ANNE B. BARNHART
          Defendant.

## DECISION AND ORDER

Despite the deferential standard of review applicable to social security appeals, district courts reverse or remand more than fifty percent of the time, a rate that has been increasing. Paul Verkuil & Jeffery Lubbers, <u>Alternative Approaches to Judicial Review of Social Security Disability Cases: A Report to the Social Security Board</u>, at 31 (Mar. 1, 2002), <u>available at</u> http://www.ssab.gov (last visited Dec. 23, 2005). One reason for this trend is that Administrative Law Judges ("ALJs") too often fail to explain the reasoning underlying their decisions. Of course, ALJs need not discuss their reasoning in microscopic detail, but they must explain their "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 351 (7th Cir. 2005).

In the present case, the ALJ's analysis of the two primary issues consisted of recitations of some of the evidence followed by bald conclusions. He failed to provide a bridge from the evidence to the result. Therefore, although the Commissioner creditably attempts to salvage the decision by providing the rationale the ALJ omitted, I must reverse

and remand. See Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (holding that the ALJ must rationally articulate the grounds for his decision, and the court must confine its review to the reasons he provided).

## I. BACKGROUND

On May 29, 1995, Milo Baker was born prematurely, weighing just two pounds, six ounces. In July 1995, based on his low birth weight and prematurity, he was awarded supplemental security income ("SSI"). In April 2002, the Social Security Administration ("SSA") reviewed his case and determined that his condition had improved such that he was no longer entitled to benefits. His mother, Michelle Baker ("plaintiff"), appealed the decision, contending that Milo continued to have significant problems in understanding and concentrating, but the ALJ found that he was no longer disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the SSA. Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005). Plaintiff then commenced the present action on Milo's behalf seeking judicial review of the ALJ's decision. 42 U.S.C. § 405(g).

## II. APPLICABLE LEGAL STANDARDS

**A.   Disability Standard for Children**

The SSA has adopted a sequential three-step test for determining whether a child-claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; and (3) if so, whether the impairment meets, equals or functionally equals an impairment listed in SSA regulations as being presumptively disabling. See 20 C.F.R. § 416.924. In determining whether an impairment meets or equals a Listed impairment, the

2

evaluation for a child is much the same as for an adult: the claimant must satisfy all of the specific criteria of the particular Listing. See Keys v. Barnhart, 347 F.3d 990, 992 (7th Cir. 2003); Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). If the child-claimant does not meet or equal a Listing, the ALJ must determine whether his impairment "results in limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a). The ALJ does this by evaluating the claimant's degree of limitation (i.e., extreme, marked, less than marked, or no limitation) in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. § 416.926a(b)(1). If the ALJ determines that the claimant has "marked" limitations in two domains or an "extreme" limitation in one domain, he must find the child disabled. § 416.926a(a).

> "Marked" and "extreme" limitations in a given domain can be established by standardized test scores that are two or three standard deviations, respectively, below the mean – that is, either in the lowest 2.5 percent of the distribution or the lowest 1 percent – provided, however, that the scores are representative of day-to-day functioning. 20 C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). Test scores are not conclusive, therefore, and the bulk of 20 C.F.R. § 416.926a is devoted to "general descriptions of each domain" against which a claimant's functioning may be compared; and so when the dust settles, the agency retains substantial discretion[.]

Keys, 347 F.3d at 994.

**B.    Medical Improvement/Cessation of Benefits**

After a claimant is found disabled, the SSA periodically evaluates his impairments to determine whether he is still eligible for benefits. See 20 C.F.R. §§ 404.1589 & 416.994a. The agency refers to this as a "continuing disability review." § 404.1589. The review is comprised of three steps. First, the SSA considers whether the claimant has

3

experienced "medical improvement" since the previous determination.[1] § 404.994(a)(1). If not, the SSA will, subject to a few exceptions, find that the claimant is still disabled. Second, if the SSA finds medical improvement, it considers whether the claimant's impairment now meets or medically or functionally equals the severity of the Listing it met or equaled at the time of the previous determination. If so, the SSA will find the claimant still disabled, unless an exception applies. Third, if the impairment no longer meets or equals the Listing it previously met or equaled, the SSA considers whether the claimant is currently disabled under the three-step test described above. See § 404.994(a)(1). If not, it terminates the claimant's benefits.

**C. Review of ALJ's Decision**

In social security appeals, the district court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). However, if the ALJ commits an error of law, the district court must reverse regardless of the volume of evidence in support of the factual findings. Id. The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996).

---

[1]This is referred to as the "comparison point decision" ("CPD").

4

Even if the evidence in the record supports the decision, the court cannot uphold it if the ALJ's reasoning does not build an accurate and logical bridge between the evidence and the result. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

### III. FACTS

**A.    Administrative History**

In June 1995, the SSA determined that Milo equaled Listing 100.02 based on low birth weight. (Tr. at 44). In January 1997, the SSA commenced a continuing disability review (Tr. at 45) and in April 1997 found Milo no longer disabled (Tr. at 49). Plaintiff requested reconsideration (Tr. at 59) and on March 3, 1998, appeared before a disability hearing officer ("DHO") (Tr. at 63). The DHO found medical improvement, i.e., that Milo had good growth and no signs of physical impairment or motor deficits related to his premature birth (Tr. at 67-68); that his impairment no longer met the Listing from the CPD (Tr. at 68-69); but that he remained disabled based on a "marked" limitation in the area of cognition and an "extreme" limitation in communication, which functionally equaled Listing 111.09 (Tr. at 69-70). Therefore, the DHO reinstated Milo's benefits. (Tr. at 71-73.)

In September 2001, the SSA commenced another continuing disability review and on April 11, 2002 again discontinued benefits. (Tr. at 77.) Plaintiff requested reconsideration (Tr. at 81), but this time the DHO found Milo not disabled (Tr. at 97). The DHO concluded that since the March 1998 CPD Milo had made significant gains in his overall functioning, including in communication and cognition, and thus no longer functionally equaled Listing 111.09. (Tr. at 93-94.) The DHO found Milo limited to "less

5

than a marked" degree in the domain of acquiring and using information, with no significant limitations in the other domains. (Tr. at 92-93.)

Plaintiff requested a hearing before an ALJ (Tr. at 101), and on January 21, 2004 she appeared with counsel before ALJ Dale Garwal. (Tr. at 653).

**B.    Hearing Testimony**

Plaintiff testified that Milo was eight years old, in the third grade and not doing well in school. On a recent report card, he received mostly zeroes. (Tr. at 659; see also Tr. at 621.) Plaintiff testified that Milo's teachers said that he sat in the classroom staring like he did not know what to do and that he did not complete his assignments. (Tr. at 660.) Although Milo was enrolled in special speech and language classes and tutored three days a week after school, it did not seem to help. (Tr. at 662.) Plaintiff stated that she tried to help Milo with his homework, but she could not read his writing and he was too hyper to sit down and do the work. (Tr. at 660-61.)

Plaintiff testified that Milo had friends, but they bossed him around and he did whatever they said. She stated that he frequently wandered off, requiring her to find him. (Tr at 667-68.) She said that he liked to play with toys that involved fighting, that he had a short attention span when playing, and that he threw things against the wall when he became frustrated or when she tried to discipline him. (Tr. at 668-69.)

Milo's grandmother testified that she watched Milo about four days per week, and that he was "real evil" when she picked him up from school, kicking the seat and acting up. She stated that he calmed down if she took him to McDonald's and got him some food and a toy. (Tr. at 677.) She testified that she tried to help him with homework, but he would not sit still to do it. (Tr. at 678.) She stated that others did not want to watch Milo because

6

they knew he was a problem, and that she had become hysterical watching him. (Tr. at 680.)

**C.    Medical/Documentary Evidence**[2]

On May 23, 2001, when Milo was almost six years old, Milwaukee Public Schools ("MPS") completed an Individualized Education Program ("IEP") for him, indicating that he had received 2.8 years of speech therapy and made steady progress but still suffered from delays in receptive and expressive language. On testing, Milo scored in the 18th percentile in auditory comprehension and the 13th percentile in expressive communication. (Tr. at 258.) His language comprehension and expression skills, as well as his reading and writing skills, were improving but still not at the late K5 level. (Tr. at 259.) The report stated that Milo at times had difficulty understanding directions, was easily distracted, and needed constant reminders to stay on task. (Tr. at 262.) The IEP concluded that although Milo had "made great gains this school year, concerns still existed in the areas of reading readiness, auditory comprehension, and expressive communication." (Tr. at 258.) The IEP recommended continued speech and language therapy (Tr. at 258), small group or one-on-one activities outside the classroom for part of the week, and one-on-one assistance in the regular classroom whenever possible (Tr. at 263).

---

[2]Because the issue in the present case is medical improvement by April 2002, I will focus on the records relating to that time. Further, the record does not suggest that any physical maladies rendered Milo disabled. Although he suffered seizures when he was 1-½ years old (Tr. at 292-94), that problem does not appear to have continued into the relevant time period. Milo also suffered such ailments as a sore throat, ear ache and fever (Tr. at 412-17; 533-49), and possible pneumonia (Tr. at 488-91). He was also treated after a car accident (Tr. at 496-99) and seen by various doctors for a skin condition (Tr. at 397-99; 419-23).

On March 27, 2002, at the behest of the SSA, James L. Paquette, Ph.D. evaluated Milo. Dr. Paquette noted Milo to be attentive, cooperative, helpful and placid without attention-deficit or hyperactivity disorder features. He found Milo's expressive language adequate, his speech spontaneous and 95 percent intelligible. (Tr. at 384.) According to the Wechsler Intelligence Scale for Children ("WISC-III"), Milo's cognitive functioning was in the borderline range with a full scale composite of 78 at the 7th percentile, performance composite of 82 at the 12th percentile, and verbal composite of 78 at the 7th percentile. Milo's fund of information was in the borderline range, his arithmetic reasoning was impaired, his abstract reasoning limited/borderline, and practical judgment/reasoning low-average. (Tr. at 385.)

On April 20, 2002, Michael Mandli, PhD completed a Childhood Disability Evaluation Form for the SSA, stating that medical improvement had occurred and that Milo had no severe impairment. Dr. Mandli concluded that Milo's IQ scores were in the low-average range, his current speech and language skills were commensurate, and while he still had some articulation problems he was 95 percent intelligible. (Tr. at 388-89.)

In Milo's May 20, 2002 IEP, MPS indicated that at times he continued to have difficulty understanding directions and his reading ability remained low, but he participated eagerly in all speech therapy activities and was mostly friendly and cooperative. The IEP again recommended that he participate in small group or one-on-one therapy activities outside the classroom for part of the week and one-on-one assistance in the regular classroom whenever possible. (Tr. at 276-77; 282.)

In a progress report from the first quarter of the 2002-03 school year, Milo's teacher indicated that he was completing more work in social studies than in the beginning of the

8

year, but he sometimes did not finish his work in class. (Tr. at 555.) In language arts, his teacher indicated that Milo was doing better with interpreting writing. In math, his teacher noted better effort, but he still needed improvement in basic skills. (Tr. at 556.) In science, his teacher indicated that Milo had "done really well," though she wanted him to complete work he missed when absent. (Tr. at 557.)

In a report from the second quarter of the 2002-03 year, Milo's teacher noted that Milo had difficulty completing social studies assignments and projects in class, was easily frustrated and gave up quickly unless someone sat with him and gave him the answers. (Tr. at 284.) His reading teacher indicated that Milo worked hard most days, but his behavior could cause him to become distracted. In language arts, his teacher indicated that Milo had major difficulty writing even simple sentences and struggled with writing on a line. In math, Milo's teacher indicated that he struggled with basic math concepts and was often frustrated and confused. (Tr. at 285.)

In Milo's third quarter report for 2002-03, his teacher noted that he had done well on social studies projects but needed to put forth more effort. (Tr. at 561.) In language arts, Milo's teacher indicated that he worked hard but was still behind in his basic writing skills. In math, his teacher stated that Milo did well with a lot of one-on-one and oral explanations, and did really well with fractions because that unit was very visual. (Tr. at 563.) His art teacher stated that Milo did little work and spent most of the time walking around, talking, and not following class rules. In science, his teacher stated that Milo had done a great job that quarter. (Tr. at 558.)

9

In Milo's fourth quarter report, his teacher stated that he had shown a lot of progress but should continue to work on phonics, read at least twenty minutes per day, and work on basic addition and subtraction principles. (Tr. at 560.)

On January 14, 2003, Cathy Propper, PhD completed a Childhood Disability Evaluation Form for the SSA, in which she opined that plaintiff had a less than marked limitation in acquiring and using information, and no limitations in the other domains. (Tr. at 426-31.)

A home report based on testing done on April 17, 2003, showed Milo to be in the 1st percentile for reading (lower than 99 percent of his peers), 10th percentile for language, 1st percentile for math, 15th percentile for science, and 2nd percentile for social studies. (Tr. at 565.)

Milo's 2003-04 (third grade) IEP, completed by MPS on October 1, 2003, indicated that on testing he scored at a 1.7 grade level in reading, 1.3 in writing, K.8 in math, and that his academic abilities lagged significantly. (Tr. at 572.) MPS planned to provide Milo with reading and math instruction in a small group in the special education classroom thirty minutes per day, support from a special education teacher during reading centers in the regular classroom, and special speech and language instruction twice per week for thirty minutes in the regular education room. He was also to receive modified homework assignments in all subjects. (Tr. at 576-77.)

Another IEP, completed on December 16, 2003 (apparently after he transferred schools), indicated that Milo read at a second grade level and performed math at a beginning second grade level. Milo was observed during class to be quiet, well behaved, and easily re-directed by the teacher when off-task. He raised his hand with questions but

appeared to have little understanding of the work on his desk. (Tr. at 596.) His inappropriate/off task behavior was not significantly different from peers, but he demonstrated some difficulty with attention/concentration. He also had severe difficulty in certain areas of information processing. (Tr. at 599.) His overall level of intellectual ability was estimated to be in the low-average range compared to peers. (Tr. at 604.) On testing, Milo's reading skills were within an average range (30th percentile), but his spelling (8th percentile) and math skills (1st percentile) were significantly low. (Tr. at 605.) The IEP concluded that Milo did not have a specific learning disability but did have a speech or language impairment (Tr. at 609) and recommended twice weekly speech and language special education (Tr. at 617).

In a questionnaire completed on January 22, 2004, Milo's third grade teacher indicated that he had serious problems in acquiring and using information (Tr. at 626) and attending and completing tasks (Tr. at 627). He also noted that Milo's poor attendance impacted on his ability to learn. (Tr. at 626; 633.)

## IV. ALJ'S DECISION

Following the three-step procedure for child-claimants, the ALJ determined that Milo had never engaged in substantial gainful activity; that he had severe impairments, i.e., speech/language problems and borderline intellectual functioning; but that none met, equaled or functionally equaled a Listing. The ALJ found that Milo had less than marked limitations in his ability to acquire and use information and to complete tasks, and no significant limitations in any other domain. (Tr. at 689.)

11

## V.  DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the credibility of her and her mother's testimony and in finding a less than marked impairment in acquiring and using information, and attending and completing tasks.  I will discuss the ALJ's consideration of the testimony in conjunction with my discussion of the two domains at issue.

### A.  Acquiring and Using Information

In this domain, the ALJ considers how well the claimant acquires or learns information, and how well he uses the information he has learned.  20 C.F.R. § 416.926a(g).  In the present case, the ALJ found as follows:

> The record establishes that the claimant has a significant gap between his receptive and expressive language skills, with his expressive vocabulary being the weaker of the 2 domains coupled with inattentiveness resulting in an inability to complete third grade reading and writing assignments and participate in academic discussions.  An individualized educational program developed in December 2003 reflects that, due to distractibility and academic delays related to an expressive language delay, the claimant requires a quiet and non-distracting setting in which to learn new oral and written language skills (Exhibit 68).  Although the claimant has special education classes 30 minutes per day 2 or 3 times per week for a total of 60 to 90 minutes per week in order to allow for modified homework assignments and a small group setting with one-to-one attention as a result of those limitations/restrictions, he is otherwise in regular classes (Exhibit 68).  Although the claimant was in the third grade as of December 2003, his reading and math were primarily at the second grade level.  As noted above, psychological testing performed in April 2002 revealed intellectual functioning within the low average to borderline range (Exhibit 53).  Based upon his review of the evidence in the file, the disability hearing officer assessed less than marked limitations in the claimant's ability to acquire and use information (see Exhibits 54 and 58).  A questionnaire completed during the 2002-2003 school year reflects that the claimant had improved effort noted by his math teacher with better completion of the homework specially accommodated for his impairments, better interpretation of writing, and completion of most art assignments due to overall better understanding of basic concepts/skills based upon better interaction with teachers and peers (Exhibit 66).  Another teacher later assessed on a questionnaire completed

> in January 2004, however, that the claimant still experiences significant problems in his ability to acquire information and complete tasks as a result of his impairments (Exhibit 72). Based upon the foregoing, the Administrative Law Judge finds that the child has significant albeit "less than marked" limitations in this domain of functioning.

(Tr. at 690-91.)

The ALJ provided no reasons for his conclusion. The "foregoing" was little more than a summary of some of the evidence; missing was any explanation of how the evidence supported the conclusion. See Johnson v. Barnhart, No. 05-C-129, 2005 U.S. Dist. LEXIS 30087, at *24 (W.D. Wis. Nov. 29, 2005) ("By merely summarizing the types of evidence he considered without describing how that evidence supported his decision, the ALJ prevented this court from performing an informed review of the reasons underlying his . . . assessment."); see also Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) ("While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.") (internal citations omitted); Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) (stating that the ALJ "must articulate at some minimal level his analysis of the evidence"). Nor did the ALJ resolve the conflict he identified between the report completed in 2002-03 (Tr. at 555-567) and the teacher questionnaire completed in January 2004 (Tr. at 625-32). See Scott v. Barnhart, 297 F.3d 589, 596 (7th Cir. 2002) ("Rather than providing a meaningful discussion of these opinions and attempting to resolve the conflict, if any, among these different diagnoses, the ALJ merely cited the exhibit numbers and concluded that Darius 'has impairments of hyperactivity with some language, speech and cognitive delays.'").

Neither the Commissioner nor the court may supply reasons for the ALJ. Steele v. Barnhart, 290 F.3d 936 (7th Cir. 2002) ("[R]egardless whether there is enough evidence

13

in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ. That is why the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion.") (internal citations and quote marks omitted). But even if I were to comb the decision for implied reasons, I could not uphold it. First, the ALJ noted that on testing Milo had low average to borderline intellectual functioning. However, such test results are not conclusive. Keys, 347 F.3d at 994. Rather, the ALJ must consider "all of the relevant information in [the] case record." 20 C.F.R. § 416.926a(g)(3); see also § 416.926a(e)(4) ("[W]e will not rely on any test score alone. No single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain."). Second, the ALJ noted that while Milo received some special education services, he mostly attended regular classes. Again, this is not dispositive. See § 416.926a(g)(3). Further, Milo required significant accommodations in school, including having assignments modified to his ability level (Tr. at 573-75), and his teacher indicated that he had "a difficult time keeping up in the general education curriculum" (Tr. at 572).

I cannot conclude that this error was harmless. See Keys, 347 F.3d at 994-95 (applying harmless error doctrine to Social Security disability decision). There is evidence in the record suggesting a "marked" limitation in this domain. For instance, Milo's third grade teacher opined that Milo had a "serious problem" in comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, and

14

applying problem-solving skills in class discussions.  (Tr. at 626.)  He further opined that Milo had a "very serious problem" in learning new material, and recalling and applying previously learned material.  (Tr. at 626.)  Further, in testing performed on April 17, 2003, Milo ranked in the 1st percentile in reading and math, 2nd percentile for social studies, 10th percentile in language, and 15th percentile for science.  (Tr. at 565.)  The October 2003 (third grade) IEP similarly indicated that Milo tested at the K.8 level in math (the lowest score achievable on the test), a 1.7 level in reading, and a 1.3 level in writing.  Despite significant past intervention he continued to lag "significantly behind in his academic abilities."  (Tr. at 572.)  The December 2003 IEP indicated that Milo had not passed any of his weekly tests.  (Tr. at 596.)

Finally, the ALJ failed to consider plaintiff's testimony in evaluating this domain. Plaintiff testified that Milo received mostly zeroes on a recent report card, did not complete his assignments, and that she could not assist him in completing his homework.  It may be that the ALJ will on remand conclude, as the Commissioner argues, that plaintiff's testimony was essentially consistent with the ALJ's conclusion; a claimant can be credible and yet not disabled under the SSA's strict standards.  However, absent some comment from the ALJ, I cannot make this assumption.  See Blom v. Barnhart, 363 F. Supp. 2d 1041, 1055 (E.D. Wis. 2005) ("Principles of administrative law preclude the court from inferring a reason for the ALJ's credibility determination[.]").

Therefore, for all of these reasons, I must reverse and remand the matter for reconsideration of this domain.

15

## B. Attending and Completing Tasks

In this domain, the ALJ considers how well the claimant is able to focus and maintain attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h). In the present case, the ALJ found as follows:

> A September 2003 participant summary of findings by the claimant's teacher reflects that the claimant's attention span fluctuates when doing work independently; but that he is attentive during teacher direction and he is able to follow the teacher's instructions. With respect to the claimant's varying degrees of inattentiveness when working independently, however, the school psychologist also noted that the claimant's behavior in that regard is not significantly different when compared with his peers (Exhibit 68). As noted above, the claimant's teacher assessed in January 2004 that the claimant has significant problems acquiring information and completing tasks (Exhibit 72). As part of his special education program, the claimant is given extended time in which to complete his assignments.
>
> Based upon these factors, the Administrative Law Judge finds that the child has less than "marked" limitations in this domain of functioning.

(Tr. at 691.)

Once again, the ALJ summarized certain pieces of evidence, then simply asserted a conclusion, without constructing a bridge from one to the other. See Sarchet, 78 F.3d at 307 ("[W]e cannot uphold a decision by an administrative agency . . . if . . . the reasons given . . . do not build an accurate and logical bridge between the evidence and the result."). Nor, once again, did he resolve the conflict between the school psychologist's report that Milo's behavior was not significantly different from peers and the January 2004 teacher report that Milo had significant problems in this area. See Kasarsky v. Barnhart, 335 F.3d 539, 543 (7th Cir. 2003) ("In coming to his decision . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected."). The

16

teacher concluded that Milo had a "very serious problem" in paying attention when spoken to directly (which manifested itself hourly), focusing long enough to finish an assigned activity or task (hourly), carry out multi-step instructions (hourly), complete class/homework assignments (daily), complete work accurately without careless mistakes (daily), and work at a reasonable pace/finishing on time (hourly). (Tr. at 627.) The teacher further opined that Milo had a "serious problem" in refocusing to task when necessary (hourly) and carrying out single-step instructions (daily). (Tr. at 627.) Because the question before the ALJ was Milo's day-to-day functioning, the teacher's opinion was important. See, e.g., Matthews v. Barnhart, 339 F. Supp. 2d 1286, 1291 (N.D. Ala. 2004) ("Teachers and school personnel know how the claimant is functioning on a day-to-day basis compared to other children of the same age who do not have impairments."); see also Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168-69 (M.D. Ala. 2005) (reversing and remanding where ALJ did not consider teacher questionnaires).

Again, the error was not harmless. While it appears that the ALJ relied primarily on the September 2003 participant summary of findings and comments by the school psychologist in the December 2003 IEP, there was other, significant evidence that the ALJ failed to properly consider. In the October 2003 IEP, Milo's regular education teacher reported that Milo had a difficult time focusing, was off-task and had a hard time keeping up in the general curriculum, was "not participating in current classroom activities, and engage[d] in inappropriate social interactions with his peers." (Tr. at 572.) The December 2003 IEP indicated that Milo's assignments had been modified to fifty percent of the spelling and written work, yet he still did not turn in the work. (Tr. at 596.) In the participant summary of findings, Milo's teacher indicated that he had poor work habits and limited

17

attention/concentration. (Tr. at 604.) It is true that the ALJ need not discuss every piece of evidence in the record, but he cannot select and discuss only that which supports his conclusion. Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001). Further, absent some explanation, I cannot tell if the ALJ discredited the evidence favorable to plaintiff or simply ignored it. Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984)

Finally, as with the first domain, the ALJ failed to even mention the testimony of plaintiff and Milo's grandmother.[3] Both testified that Milo could not sit down and complete his homework, was frequently hyper, and difficult to control. The ALJ cannot ignore such testimony but rather must explain how it factors into his decision. See Lopez v. Barnhart, 336 F.3d 535, 540 (7th Cir. 2003).

Therefore, for all of these reasons, I must reverse and remand the matter for reconsideration of this domain, as well.

## VI. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the matter is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), section four.

Dated at Milwaukee, Wisconsin, this 30th day of December, 2005.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[3] The ALJ did discuss the testimony in connection with the other domains, but because the first two domains were the only ones really at issue in the case, this was insufficient.